ROBERT C. SCHUBERT (rschubert@sjk.law) (S.B.N. 62684)
AMBER L. SCHUBERT (aschubert@sjk.law) (S.B.N. 278696)
SONUM DIXIT (sdixit@sjk.law)  (S.B.N. 353395)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St., Suite 200
San Francisco, California 94123
Telephone:    (415) 788-4220
Facsimile:    (415) 788-0161

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ROLAND PLUDE, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:25-cv-12174 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **<u>JURY TRIAL DEMANDED</u>** |
| FARMERS INSURANCE EXCHANGE, FARMERS GROUP, INC., and FARMERS NEW WORLD LIFE INSURANCE COMPANY, | |
| Defendants. | |

Upon personal knowledge as to his own acts, and based upon his investigation, the investigation of counsel, and information and belief as to all other matters, Plaintiff Roland Plude, on behalf of himself and all others similarly situated, alleges as follows:

## **SUMMARY OF THE ACTION**

1.    Plaintiff brings this class action against Farmers Insurance Exchange, Farmers Group, Inc., Farmers New World Life Insurance Company (collectively, "Farmers" or "Defendants") for their failure to adequately secure and safeguard over one million individuals' personally identifying information ("PII") including names, addresses, dates of birth, driver's license numbers, and/or the last four digits of Social Security numbers. [1]

2.    On May 30, 2025, "one of Farmers' third-party vendors alerted Farmers to suspicious activity involving an unauthorized actor accessing one of the vendor's databases containing Farmers customer information[.]"[2]

3.    The Data Breach was directly and proximately caused by Defendants' failure to implement reasonable and industry-standard data security practices necessary to protect their systems from a foreseeable and preventable cyberattack.

---

[1] Pierluigi Paganini, *Farmers Insurance Discloses a Data Breach Impacting 1.1m Customers*, SECURITY AFFAIRS (Aug. 26, 2025), https://securityaffairs.com/181576/data-breach/farmers-insurance-discloses-a-data-breach-impacting-1-1m-customers.html (last visited Dec. 22, 2025).

[2] *Notice of Security Incident*, FARMERS INSURANCE, https://www.farmers.com/content/dam/farmers/marketing/digital/aem/pdfs/disclosures/notice-of-incident.pdf (last accessed Sept. 22, 2025).

Through this wrongful conduct, the sensitive PII of thousands of individuals is now in the hands of cybercriminals, who target this sensitive data for its value to identity thieves. Plaintiff and Class Members are now at a significantly increased and impending risk of fraud, identity theft, and similar forms of criminal mischief—risks which may last the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes. Moreover, Plaintiff and Class Members have lost the inherent value of their private data.

4.      By aggregating information obtained from the Data Breach with other sources or other methods, criminals can assemble a full dossier of private information on an individual to facilitate a wide variety of frauds, thefts, and scams. Criminals can and do use victims' names and other personal information to open new financial accounts, incur credit charges, obtain government benefits and identifications, fabricate identities, and file fraudulent tax returns well before the person whose PII was stolen becomes aware of it. Any one of these instances of identity theft can have devastating consequences for the victim, causing years of often irreversible damage to their credit scores, financial stability, and personal security.

5.      Defendants have not informed Plaintiff and Class Members how the "cyber criminals" accessed Defendants' systems and the root cause of the Data Breach, whether the exfiltrated information was encrypted or anonymized, why it took so long to notify victims, or what specific remedial steps Defendants have taken to

safeguard PII within their systems and networks (or otherwise purge unnecessary information) and to prevent further cyberattacks going forward. Without these critical details, Plaintiff and Class Members cannot meaningfully mitigate the resulting effects of the Data Breach.

6.      Plaintiff is a Data Breach victim and received a notification of the Data Breach from Farmers on or around August 22, 2025.[3]

7.      As a result of Defendants' conduct and the resulting Data Breach, Plaintiff's and Class Members' privacy has been invaded, their PII is now in the hands of criminals, they have either suffered or will suffer fraud or identity theft or face an imminent and ongoing risk of identity theft and fraud. Accordingly, these individuals now must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

8.      Plaintiff, on behalf of himself and all others similarly situated, herein alleges claims for negligence, breach of implied contract, and violation of California's Unfair Competition Law. Plaintiff on behalf of himself and the Class, seeks: (i) actual damages, economic damages, statutory damages, and nominal damages; (ii) punitive damages; (iii) fees and costs of litigation; (iv) injunctive relief, including the adoption of reasonably sufficient practices to safeguard PII in Defendants' custody, care, and control in order to prevent incidents like the Data Breach from recurring in the future

---

[3] *See* Exhibit A.

3

and for Defendants to provide long-term identity theft protective services to Plaintiff and Class Members; and (v) such other relief as the Court deems just and proper.

## **PARTIES**

**A.     Plaintiff**

9.     Plaintiff Roland Plude is a resident and citizen of Texarkana, Texas.

**B.     Defendants**

10.     Defendant Farmers Insurance Exchange is an unincorporated association with its headquarters and principal place of business at 6301 Owensmouth Avenue, Woodland Hills, California 91367.

11.     Defendant Farmers Group, Inc. is an insurance management and holding company organized and incorporated under the laws of the State of Nevada. Farmers Group, Inc. is the parent company of Farmers New World Life Insurance Company. Farmers Group, Inc.'s principal place of business is at 6301 Owensmouth Avenue, Woodland Hills, California 91367.

12.     Defendant Farmers New World Life Insurance Company is organized and incorporated under the laws of the State of Washington. It is a subsidiary of Farmers Group, Inc. and operates the life insurance aspect of Farmers Group, Inc. Farmers New World Life Insurance Company has its headquarters and principal place of business at 3120 139th Avenue SE, Bellevue, Washington 98005.

## **JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one member of the putative Class, as defined below, is a citizen of a state other than that of any Defendant, there are more than 100 putative Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

14.     This Court has general personal jurisdiction over Farmers Insurance Exchange and Farmers Group, Inc. because they maintain their principal place of business in this District, regularly conduct business in this District, and have sufficient minimum contacts in this District, such as to not offend traditional notions of fair play and substantial justice.

15.     This Court has personal jurisdiction over Farmers New World Life Insurance Company because its parent company, Farmers Group, Inc., maintains its headquarters and principal place of business in California. Farmers New World Life Insurance Company also conducts substantial business in this District, including the operations of life insurance agents at over 30 brick and mortar locations within the District, engages in the conduct at issue in California, and/or otherwise has substantial contacts with this District and purposefully avails itself of the Courts in this District.

16.     Venue in this District is proper under 28 U.S.C. §§ 1391(a)(1)-(2), 1391(b)(1)-(2), and 1391(c)(2) because Defendants Farmers Insurance Exchange and Farmers Group, Inc. resides in this District and a substantial part of the conduct giving

rise to Plaintiff's claims occurred in this District, including Defendant Farmers Group, Inc. collecting or storing the PII of Plaintiff and the putative Class Members.

## **FACTUAL BACKGROUND**

**A.    Defendants Collect, Store, and Maintain Personally Identifiable Information**

17.    Farmers was founded in 1928 and is now one of the nation's largest insurance companies.[4]

18.    In the regular course of business, Farmers collects a variety of data from its customers, including but not limited to health insurance information, biometric information, Social Security numbers, and financial information.[22][5]

19.    Farmers claims to protect its customers' data as customers are its "most valued assets."[6] Farmers represents that "[p]rotecting your privacy is important to us. We restrict access to personal information to those individuals, such as our employees and agents, who provide you with our products and services."[7]

20.    Farmers also claims to have numerous safeguards to prevent the unauthorized exfiltration of data. For example, Farmers "require[s] individuals with

---

[4] *About Us,* FARMERS INSURANCE, https://www.farmers.com/about-us/ (last accessed Sept. 19, 2025).

[5] *Privacy Policy*, FARMERS INSURANCE, https://www.farmers.com/content/farmers/marketing/digital/aem/pdfs/privacy-center/Farmers-Privacy-Notice.pdf (last accessed Sept. 19, 2025).

[6] *Id.*

[7] *Id.*

6

access to your information to protect it and keep it confidential. We maintain physical, electronic, and procedural safeguards that comply with applicable regulatory standards to guard your nonpublic personal information."[8]

21.    Finally, Farmers does "not disclose any nonpublic personal information about [customers] except as described in this notice or as otherwise required or permitted by applicable law."[9]

22.    Farmers' annual revenue was $14.1 billion as of 2025.[10]

23.    Despite these strong proclaimed proactive policies and approaches to data security and privacy for their customers, Farmers failed to adequately secure and safeguard their systems and networks from a foreseeable and preventable cyberattack. This conduct proximately resulted in the Data Breach and significant harm to Plaintiff and the Class.

**B.    The Data Breach Exposed Valuable PII**

24.    "On May 30, 2025, one of Farmers' third-party vendors alerted Farmers to suspicious activity involving an unauthorized actor accessing one of the vendor's databases containing Farmers customer information[.]"[11]

---

[8] *Id.*

[9] *Id.*

[10] https://rocketreach.co/farmers-insurance-profile_b5c6157af42e0c4d (last accessed Sept. 22, 2025).

[11] Notice of Security Incident, FARMERS INSURANCE, https://www.farmers.com/content/dam/farmers/marketing/digital/aem/pdfs/disclosures/notice-of-incident.pdf (last accessed Sept. 22, 2025).

7

25.     Despite Defendants' duties and commitments to safeguard sensitive and private information, Defendants failed to follow industry-standard practices in securing Plaintiff's and the Class Members' PII, as evidenced by the Data Breach.

**C.     Defendants Had Ample Notice That They Were Likely Cyberattack Targets**

26.     At all relevant times, Defendants knew, or should have known, that the PII they were entrusted with was a target for malicious actors. Defendants knew this given the unique type and the significant volume of data on their networks, servers, and systems, comprising individuals' detailed and confidential personal information and, thus, the significant number of individuals who the exposure of the PII would harm.

27.     As custodian of Plaintiff's and Class Members' PII, Defendants knew or should have known the importance of protecting their PII, and of the foreseeable consequences and harms to such persons if any data breach occurred.

28.     According to the Consumer Financial Protection Bureau, the number of data breach and identity theft complaints it received grew from 14,319 in 2020 to 32,469 in 2022.[12] It is well known among companies that PII such as social security numbers and financial information is valuable and frequently targeted by criminals.

---

[12] *See Compromised: Why experts say data breaches are on the rise,* NBC 6 SOUTH FLORIDA, https://www.nbcmiami.com/responds/compromised-why-experts-say-data-breaches-are-on-the-rise/3473306/ (last accessed June 5, 2025).

8

29.    The Federal Trade Commission has warned consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[13]

30.    In April 2020, ZDNet reported that "ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[14]

31.    Criminals can commit all types of fraud, including: obtaining a driver's license or official identification card in the victim's name but the thief's picture, using the victim's name and SSN to obtain government benefits, to obtain lending or lines of credit, filing a fraudulent tax return using the victim's information. Identity thieves may obtain a job using the victim's social security number, rent a house, or give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[15]

---

[13] *See* What to Know About Identity Theft, FEDERAL TRADE COMMISSION (Sept. 2024), https://consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed June 5, 2025).

[14] Catalin Cimpanu, *Ransomware mentioned in 1,000+ SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed Sept. 1, 2025).

[15] *See* Warning Signs of Identity Theft, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed June 5, 2025).

32.    Defendants' security obligations were especially important due to the substantial increase of cyberattacks and data breaches in recent years.

33.    Defendants knew or should have known that as large corporations, they are prime targets of ransomware actors. Defendants also knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack.

**D.    Defendants Breached Their Duties to Plaintiff and Class Members, and Failed to Comply with Regulatory Requirements and Industry Practices.**

34.    Because Defendants were entrusted with PII at all times herein relevant, Defendants owed to Plaintiff and the Class a duty to exercise commercially reasonable methods and care in handling, using, maintaining, storing, and safeguarding the PII in their care, control, and custody, including by implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that occurred, and to promptly detect and thwart attempts at unauthorized access to their networks and systems. Defendants also owed a duty to safeguard PII because they were on notice that they were handling highly valuable data and knew there was a significant risk it would be targeted by cybercriminals. Furthermore, Defendants knew of the extensive, foreseeable harm that would ensue for the victims of a data breach, and therefore also owed a duty to reasonably safeguard that information.

35.    Security standards commonly accepted among businesses like Defendants that store PII include, without limitation:

      i.    Maintaining a secure firewall configuration;

      ii.    Monitoring for suspicious or irregular traffic to servers or networks;

      iii.    Monitoring for suspicious credentials used to access servers or networks;

      iv.    Monitoring for suspicious or irregular activity by known users;

      v.    Monitoring for suspicious or unknown users;

      vi.    Monitoring for suspicious or irregular server requests;

      vii.    Monitoring for server requests for PII;

      viii.    Monitoring for server requests from VPNs; and

      ix.    Monitoring for server requests for Tor exit nodes.

36.    The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[16] and protection of PII which includes basic security standards applicable to all types of businesses.[17]

37.    The FTC recommends that businesses:

---

[16] Start with Security: A Guide for Business, FTC (June 2015), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[17] Protecting Personal Information: A Guide for Business, FTC (Oct. 2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

i.      Identify all connections to the computers where sensitive information is stored.

ii.     Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

iii.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

iv.     Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

v.      Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

vi.     Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

vii.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on

the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

viii.    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

ix.    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

38.    As described further below, Defendants owed a duty to safeguard PII under the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act") to ensure that all information they received, maintained, and stored was secure. This statute was enacted to protect Plaintiff and the Class Members from the type of conduct in which Defendants engaged, and the resulting harms Defendants proximately caused Plaintiff and the Class Members.

39.    Under the FTC Act, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

40.    Defendants breached their duty to exercise reasonable care in protecting Plaintiff's and Class Members' PII by failing to implement and maintain adequate data security measures to safeguard Plaintiff's and Class Members' sensitive personal information, failing to encrypt or anonymize PII within their systems and networks, failing to monitor their systems and networks to promptly identify and thwart suspicious activity, allowing unmonitored and unrestricted access to unsecured PII, and allowing (or failing to prevent) unauthorized access to, and exfiltration of, Plaintiff's and Class Members' confidential and private information. Additionally, Defendants breached their duty by utilizing outdated and ineffectual data security measures which deviated from standard industry best practices at the time of the Data Breach. Through these actions, Defendants also violated their duties under the FTC Act.

41.    Defendants failed to prevent the Data Breach. Had Defendants properly maintained and adequately protected their systems, servers, and networks, the Data Breach would not have occurred.

42.    Additionally, the law imposes an affirmative duty on Defendants to timely disclose the unauthorized access and theft of PII to Plaintiff and Class Members so that they can take appropriate measures to mitigate damages, protect against

14

adverse consequences, and thwart future misuses of their private information. In so doing, Defendants actually and proximately caused and exacerbated the harm from the Data Breach and the injuries-in-fact of Plaintiff and Class Members.

**E.    The Experiences of Plaintiff**

43.    Plaintiff was a customer of Farmers Insurance for at least five years until May or June 2025.

44.    Farmers terminated Plaintiff's coverage on his summer property in Angel Fire, New Mexico in May or June 2025 due to wildfire risk.

45.    Plaintiff trusted that Defendants would use reasonable measures to protect his data according to state and federal law.

46.    Plaintiff attempted to enroll in the free MyTrueIdentity credit monitoring service provided by Farmers, but was unable to even after an hour on the phone with customer service.

47.    In response to the breach, Plaintiff froze his credit.

48.    Plaintiff purchased an annual subscription of credit and identity monitoring from Equifax for $300.

49.    Plaintiff is concerned that the money in his bank account is not secure.

50.    Plaintiff is considering purchasing data protection services from his home title company.

51.    As a proximate result of the Data Breach, Plaintiff will spend time for the foreseeable future and beyond dealing with its consequences and self-monitoring his

15

accounts and credit reports to monitor potentially suspicious and fraudulent activity. This time will be lost forever and cannot be recaptured.

52.     Plaintiff has and is experiencing fear, stress, and frustration because his sensitive information was stolen in the Data Breach, and not knowing by whom or for what purpose. This goes beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a data breach victim that the law contemplates and addresses.

53.     Plaintiff suffered actual injuries in the form of damages to and diminution in the value of his PII—a form of intangible property that was entrusted to Defendant—which was compromised in and as a proximate result of the Data Breach.

54.     Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from his PII being obtained by unauthorized third parties and possibly cybercriminals.

55.     Plaintiff has a continuing interest in ensuring that his PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches or cybersecurity risks.

56.     Defendants deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it. Farmers waited nearly three months to notify Plaintiff after it learned of the Data Breach.

**F.     Plaintiff and the Class Suffered Actual and Impending Injuries Resulting From the Data Breach**

57.     As a proximate result of Defendants' completely unreasonable security practices, identity thieves now possess the sensitive PII of Plaintiff and the Class. That information is extraordinarily valuable on the black market and incurs direct costs to Plaintiff and the Class. On the dark web—an underground Internet black market—criminals openly buy and sell stolen PII to create "identity kits" worth up to $2,000 each that can be used to create fake IDs, gain access to bank accounts, social media accounts, and credit cards, file false insurance claims or tax returns, or rack up other kinds of expenses.[18] And, "[t]he damage to affected [persons] may never be undone."[19]

58.     Unlike the simple credit-card breaches at retail merchants, these damages cannot be avoided by canceling and reissuing plastic cards or closing an account. Identity theft is far more pernicious than credit card fraud. Criminals' ability to open entirely new accounts—not simply prey on existing ones—poses far more dangerous problems. Identity thieves can retain the stolen information for years until the controversy has receded because victims may become less vigilant in monitoring their accounts as time passes. Then, at any moment, the thief can take control of a victim's

---

[18] Nick Culbertson, *Increased Cyberattacks on Healthcare Institutions Shows the Need for Greater Cybersecurity* (Jun. 7, 2021), FORBES, https://www.forbes.com/sites/forbestechcouncil/2021/06/07/increased-cyberattacks-on-healthcare-institutions-shows-the-need-for-greater-cybersecurity/?sh=ca928c05650d.

[19] *Id.*

identity, resulting in thousands of dollars in losses and lost productivity. The U.S. Department of Justice has reported that in 2021, identity theft victims spent on average about four hours to resolve problems stemming therefrom and that the average financial loss experienced by an identity theft victim was $1,160 per person.[20] Additionally, about 80% of identity theft victims reported some form of emotional distress resulting from the incident.[21]

59.     As a consequence of the Data Breach, Class Members' credit profiles can be destroyed before they even realize what happened, and they may be unable to legitimately borrow money, obtain credit, or open bank accounts. Class Members can be deprived of legitimate tax refunds or, worse yet, may face state or federal tax investigations due to fraud committed by an identity thief. And even the simple preventive step of adding oneself to a credit-fraud watch list to guard against these consequences substantially impairs Class Members' ability to obtain additional credit. In fact, many experts advise victims to place a freeze on all credit accounts, making it

---

[20] Erika Harrell and Alexandra Thompson, Victims of Identity Theft, 2021, U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS (Oct. 2023), *available at* https://bjs.ojp.gov/document/vit21.pdf.

[21] *Id.*

impossible to rent a car, get student loans, buy or rent big-ticket items, or complete a major new car or home purchase.

### CLASS ACTION ALLEGATIONS

60.    Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3), and where applicable, 23(c)(4), Plaintiff seeks certification of the following Class:

> All persons in the United States who were impacted by the Data Breach, including all persons who were sent notice by Farmers that their PII was compromised as a result of the Data Breach (and each person a "Class Member").

61.    Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

62.    This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and 23(b)(3), and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these rules.

63.    *Numerosity Under Rule 23(a)(1)*. The Class is so numerous that the individual joinder of all members is impracticable, and the disposition of the claims of all members of the Class in a single action will provide substantial benefits to the

19

parties and the Court. Upon information and belief, Plaintiff estimates that the Class is comprised of millions of Class Members. The Class is sufficiently numerous to warrant certification.

64.    _Commonality Under Rule 23(a)(2)_. Common legal and factual questions exist that predominate over any questions affecting only individual members of the Class. These common questions, which do not vary among members of the Class and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a.    Whether Defendants knew or should have known that their computer systems and networks were vulnerable to unauthorized third-party access or a cyberattack;

b.    Whether Defendants failed to utilize and maintain adequate and reasonable security and preventive measures to ensure that their computer systems and networks were protected;

c.    Whether Defendants failed to take available steps to prevent and stop the Data Breach from occurring;

d.    Whether Defendants failed to comply with their own policies and applicable laws, regulations and industry standards relating to data security;

e.    Whether Defendants owed a legal duty to Plaintiff and Class Members to protect their PII;

f.      Whether Defendants breached any duty to protect the PII of Plaintiff and Class Members by failing to exercise due care in protecting their sensitive and private information;

g.      Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the breach of their systems, resulting in the loss of the PII of Plaintiff and Class Members.

h.      Whether Defendants provided timely, accurate, and sufficient notice of the Data Breach to Plaintiff and the Class Members;

i.      Whether Plaintiff and Class Members have been damaged by the wrongs alleged and are entitled to actual, statutory, or other forms of damages and other monetary relief; and

j.      Whether Plaintiff and Class Members are entitled to injunctive or equitable relief, including restitution.

65.     *Typicality Under Rule 23(a)(3)*. Plaintiff's claims are typical of the claims of the Class. Plaintiff had his PII compromised in the Data Breach. Defendants' uniformly unlawful course of conduct injured Plaintiff and Class Members.

66.     *Adequacy of Representation Under Rule 23(a)(4)*. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and consumer protection class action matters such as this action, and Plaintiff and his counsel intend to vigorously prosecute this action for the Class's

1    benefit and have the resources to do so. Plaintiff and his counsel have no interests

2    adverse to those of the other members of the Class.

3    67.    *Predominance and Superiority*. A class action is superior to all other

4    available methods for the fair and efficient adjudication of this controversy because

5    individual litigation of each Class Member's claim is impracticable. The damages,

6    harm, and losses suffered by the individual members of the Class will likely be small

7    relative to the burden and expense of individual prosecution of the complex litigation

8    necessitated by Defendants' wrongful conduct. Even if each Class Member could

9    afford individual litigation, the Court system could not. It would be unduly

10    burdensome if tens of thousands of individual cases or more proceeded. Individual

11    litigation also presents the potential for inconsistent or contradictory judgments, the

12    prospect of a race to the courthouse, and the risk of an inequitable allocation of

13    recovery among those individuals with equally meritorious claims. Individual

14    litigation would increase the expense and delay to all parties and the Courts because

15    it requires individual resolution of common legal and factual questions. By contrast,

16    the class action device presents far fewer management difficulties and provides the

17    benefit of a single adjudication, economies of scale, and comprehensive supervision

18    by a single court.

19    68.    As a result of the foregoing, class treatment under Fed. R. Civ. P. 23(a),

20    (b)(2), and (b)(3), and (c)(4) is appropriate.

### FIRST CAUSE OF ACTION
**Negligence**
*(On Behalf of Plaintiff and the Class)*

69.     Plaintiff incorporates the above allegations as if fully set forth herein.

70.     Because Defendants were entrusted with such PII at all times herein relevant, they owed to Plaintiff and the Class a duty to exercise commercially reasonable methods and care in handling, using, maintaining, storing, and safeguarding the PII in their care, control, and custody, including by implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that occurred, and to promptly detect and thwart attempts at unauthorized access to their networks and systems. This duty arose independently from any contract.

71.     Defendants knew, or should have known, of the risks inherent in collecting and storing massive amounts of PII, including the importance of adequate data security and the high frequency of ransomware attacks and well-publicized data breaches. Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure to adequately safeguard their PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that sensitive information. Indeed, on their websites, Defendants commit to data privacy, including safeguarding PII.

72.     Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and the Class's PII by failing to limit access to this

23

information to unauthorized third parties and by not properly supervising both the way the PII was stored, used, and exchanged, and those in their employ responsible for such tasks.

73.    Defendants owed to Plaintiff and members of the Class a duty to notify them within a reasonable timeframe of any breach to the security of their PII. Defendants also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and circumstances of the Data Breach. This duty is required and necessary for Plaintiff and the Class to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

74.    Defendants also had a common law duty to prevent foreseeable harm to others. Defendants had full knowledge of the sensitivity and high value of the PII that they stored and the types of foreseeable harm and injury-in-fact that Plaintiff and Class Members could and would suffer if that PII were wrongfully disclosed, leaked, accessed, or exfiltrated. Defendants' conduct created a foreseeable and unreasonable risk of harm to Plaintiff and Class Members, who were the foreseeable victims of Defendants' inadequate data security practices.

75.    Defendants violated their duty to implement and maintain reasonable security procedures and practices, including through their failure to adequately restrict access to their systems that held millions of individuals' PII or encrypt or anonymize such data. Defendants' duty included, among other things, designing, maintaining, and

testing their information security controls to ensure that PII in their possession was adequately secured by, for example, encrypting or anonymizing sensitive personal information, installing intrusion detection and deterrent systems and monitoring mechanisms, and using access controls to limit access to sensitive data.

76.    Defendants' duty of care also arose pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act"), under which Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

77.    The FTC Act was enacted to protect Plaintiff and the Class Members from the type of wrongful conduct in which Defendants engaged.

78.    Defendants' violation of the FTC Act constitutes negligence *per se* for purposes of establishing the duty and breach elements of Plaintiff's negligence claim. Those statutes were designed to protect a group to which Plaintiff belongs and to prevent the types of harm that resulted from the Data Breach.

79.    Defendants breached their duty to exercise reasonable care in protecting Plaintiff's and Class Members' PII by failing to implement and maintain adequate data security measures to safeguard Plaintiff's and Class Members' sensitive personal information, failing to encrypt or anonymize PII within their systems and networks, failing to monitor their systems and networks to promptly identify and thwart suspicious activity, failing to delete and purge PII no longer necessary for its provision of services to their clients and customers, allowing unmonitored and unrestricted

25

access to unsecured PII, and allowing (or failing to prevent) unauthorized access to, and exfiltration of, Plaintiff's and Class Members' confidential and private information. Additionally, Defendants breached their duty by utilizing outdated and ineffectual data security measures which deviated from standard industry best practices at the time of the Data Breach. Through these actions, Defendants also violated their duties under the FTC Act.

80. The law imposes an affirmative duty on Defendants to timely disclose the unauthorized access and theft of PII to Plaintiff and Class Members so that they can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuses of their private information. Farmers breached its duties by failing to provide timely notice of the Data Breach to Plaintiff and Class Members. In so doing, Defendants actually and proximately caused and exacerbated the harm from the Data Breach and the injuries-in-fact of Plaintiff and Class Members. Timely disclosure was necessary so that Plaintiff and Class Members could, among other things: (i) purchase identity theft protection, monitoring, and recovery services; (ii) flag asset, credit, and tax accounts for fraud; (iii) purchase or otherwise obtain credit reports; (iv) place or renew fraud alerts on a quarterly basis; (v) closely monitor loan data and public records; and (vi) take other meaningful steps to protect themselves and attempt to avoid or recover from identity theft and other harms.

81.     In 2025, Farmers' revenue was estimated to be $14.1 billion. Accordingly, Farmers had the financial and personnel resources necessary to prevent the Data Breach. Farmers nevertheless failed to adopt reasonable data security measures, in breach of the duties it owed to Plaintiff and Class Members.

82.     Plaintiff and Class Members had no ability to protect their PII once it was in Defendants' possession and control. Defendants were in an exclusive position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

83.     But for Defendants' breach of duty to adequately protect Class Members' PII, Class Members' PII would not have been stolen. As a result of Defendants' negligence, Plaintiff and Class Members suffered and will continue to suffer the various types of damages alleged herein. There is a temporal and close causal connection between Defendants' failure to implement adequate data security measures, the Data Breach, and the harms suffered by Plaintiff and Class Members.

84.     As a direct and traceable result of Defendants' negligence, Plaintiff and the Class have suffered or will suffer an increased and impending risk of fraud, identity theft, damages, embarrassment, humiliation, frustration, emotional distress, and lost time and out-of-pocket costs to mitigate and remediate the effects of the Data Breach. These harms to Plaintiff and the Class include, without limitation: (i) loss of the opportunity to control how their personal information is used; (ii) diminution in the value and use of their personal information entrusted to Defendants; (iii) the

compromise and theft of their personal information; (iv) out-of-pocket costs associated with the prevention, detection, and recovery from identity theft and unauthorized use of financial accounts; (v) costs associated with the ability to use credit and assets frozen or flagged due to credit misuse, including increased costs to use credit, credit scores, credit reports, and assets; (vi) unauthorized use of compromised personal information to open new financial and other accounts; (vii) continued risk to their personal information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect the personal information in their possession; and (viii) future costs in the form of time, effort, and money they will expend to prevent, detect, contest, and repair the adverse effects of their personal information being stolen in the Data Breach.

85. Defendants' negligence was gross, willful, wanton, and warrants the imposition of punitive damages given the clear foreseeability of a hacking incident, the extreme sensitivity of the private information under Defendants' care, and their failure to take adequate remedial steps, including prompt notification of the victims, following the Data Breach.

86. Plaintiff and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate long-term identity protection services. Plaintiff and Class Members are also entitled to the injunctive relief sought herein.

**SECOND CAUSE OF ACTION**
**Breach of Implied Contract**
*(On Behalf of Plaintiff and the Class)*

87.     Plaintiff incorporates the above allegations as if fully set forth herein.

88.     Plaintiff was required to provide his PII to Farmers to obtain its insurance services.

89.     Defendants acquired, stored, and maintained the PII of Plaintiff and the Class.

90.     Plaintiff and Class Members were required to provide, or authorize the transfer of, their private information in order for Defendants to provide their services.

91.     Defendants solicited, offered, and invited Class Members to provide their private information as part of their regular business practices. Plaintiff and Class Members accepted Defendants' offer and provided their private information to Defendants.

92.     When Plaintiff and Class Members provided their PII to Defendants, they entered into implied contracts with Defendants and intended and understood that PII would be adequately safeguarded as part of that service.

93.     Defendants' implied promise of confidentiality to Plaintiff and Class Members includes consideration beyond those pre-existing general duties owed under the FTC Act, or other state or federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

29

94.    Defendants' implied promises include but are not limited to: (a) taking steps to ensure that any agents who are granted access to PII also protect the confidentiality of that data; (b) restricting access to qualified and trained agents; (c) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (d) applying or requiring proper encryption; (e) multifactor authentication for access; (f) protecting Plaintiff's and Class Members' PII in compliance with federal and state laws and regulations and industry standards; and (g) other steps to protect against foreseeable data breaches.

95.    Defendants' implied promises to safeguard Plaintiff's and Class Members' PII are evidenced by representations on Defendants' websites. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendants on the other, is further demonstrated by their conduct and course of dealing.

96.    Plaintiff and the Class Members would not have entrusted their PII to Defendants in the absence of such an implied contract. Had Defendants disclosed to Plaintiff and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and the other Class Members would not have provided their PII to Defendants.

97.    Defendants recognized that Plaintiff's and Class Members' PII is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

98.    Plaintiff and the Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

99.    Farmers breached the implied contracts made with its customers by failing to take reasonable measures to safeguard their PII as described herein, as well as by failing to provide accurate, adequate, and timely notice to them that their PII was compromised as a result of the Data Breach.

100.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class Members suffered and will continue to suffer damages from: (i) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm, (ii) the loss of the confidentiality of the stolen PII, (iii) the illegal sale of the compromised data on the dark web, (iv) lost work time, and (v) other economic and non-economic harms.

101.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to strengthen their data security systems, submit to future audits of those systems, and provide adequate long-term credit monitoring and identity theft protection services to all persons affected by the Data Breach.

### THIRD CAUSE OF ACTION
**Injunctive/Declaratory Relief**
***(On Behalf of Plaintiff and the Class)***

102.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad

31

authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

103.    Defendants owe a duty of care to Plaintiff and Class Members, which required Defendants to adequately monitor and safeguard Plaintiff's and Class Members' PII.

104.    Defendants and their officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII belonging to Plaintiff and Class Members.

105.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and the risk remains that further compromises of their private information will occur in the future.

106.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  Defendants owe a legal duty to adequately secure the PII of Plaintiff and the Class within their care, custody, and control under the common law, and Section 5 of FTC Act;

b.  Defendants breached their duty to Plaintiff and the Class by allowing the Data Breach to occur;

c.  Defendants' existing data monitoring measures do not comply with their obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the PII of Plaintiff and the Class within Defendants' custody, care, and control; and

d.  Defendants' ongoing breaches of said duties continue to cause harm to Plaintiff and the Class.

107.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiff and the Class will not have an adequate remedy at law because monetary relief alone will not compensate Plaintiff and the Class for the serious risks of future harm.

108.    The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiff and the Class

33

will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

109.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach or cybersecurity incident, thus preventing future injury to Plaintiff and the Class and other persons whose PII would be further compromised.

**<u>FOURTH CAUSE OF ACTION</u>**
**Violation of the Unfair Competition Law**
**Bus. & Prof. Code § 17200 et seq. ("UCL")**
*(On Behalf of Plaintiff and the Class)*

110.    Plaintiff, individually and on behalf of the Class, incorporates the above allegations as if fully set forth herein.

111.    Plaintiff pleads this claim for equitable relief, including restitution and injunctive relief, in the alternative to his claims for damages.

112.    The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

113.    Defendants' actions as alleged herein in this Class Action Complaint constitute an "unlawful" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200

1    *et seq.* because Defendants' actions: (a) constituted negligence; and (b) violated

2    federal law and regulations, including the FTC Act.

3        114.    Defendants' actions as alleged in this Class Action Complaint also

4    constitute an "unfair" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200

5    *et seq.*, because they offend established public policy and are immoral, unethical,

6    oppressive, unscrupulous, and substantially injurious. The harm caused by

7    Defendants' wrongful conduct outweighs any utility of such conduct and has caused—

8    and will continue to cause—substantial injury to the Class, including Plaintiff. There

9    were ample reasonably available alternatives that would have furthered Defendants'

10    legitimate business practices, including using industry-standard technologies to

11    protect data (e.g., two-factor authorization, effective encryption and anonymization,

12    compartmentalization of sensitive data, software patches, limiting how much data any

13    user may access, and the purging of data no longer necessary for Defendant's

14    services). Defendants also unreasonably delayed in notifying Plaintiff and Class

15    Members regarding the unauthorized release and disclosure of their PII.

16        115.    Defendants' conduct also is deceptive in violation of the UCL.

17    Defendants' fraudulent business acts and practices include:

18            a.    Failing to adequately secure the personal information of Plaintiff and

19                Class Members from disclosure to unauthorized third parties or for

20                improper purposes;

35

b. Enabling the disclosure of personal and sensitive facts about Plaintiff and Class Members in a manner highly offensive to a reasonable person;

c. Enabling the disclosure of personal and sensitive facts about Plaintiff and Class Members without their informed, voluntary, affirmative, and clear consent;

d. Omitting, suppressing, and concealing the material fact that Defendants did not reasonably or adequately secure Plaintiff's and Class Members' personal information.

116.    Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of their data security and ability to protect the confidentiality of Plaintiff's and Class Members' personal information.

117.    The harm from Defendants' conduct was not reasonably avoidable by consumers. Plaintiff and Class Members were required to provide their PII to Farmers to receive insurance services. Plaintiff and Class Members did not know of, and had no reasonable means of discovering, that their information would be exposed to hackers through inadequate data security measures.

118.    There were reasonably available alternatives that would have furthered Defendants' business interests of electronically transferring their customers' information while protecting PII.

119.    A reasonable person would regard Defendants' derelict data security and the Data Breach as important, material facts that could and should have been disclosed.

36

120.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent conduct, Plaintiff lost money or property because his sensitive personal information experienced a diminution of value and because he devoted additional time to monitoring his financial accounts for fraudulent activity. Plaintiff faces ongoing and impending damages related to theft of his PII.

121.    Defendants' wrongful practices constitute a continuing course of unfair competition because, on information and belief, Defendants have failed to remedy the lax security practices or even fully notify all affected California persons. Plaintiff and the Class seek equitable relief pursuant to Cal. Bus. & Prof. Code § 17203 to end Defendants' wrongful practices and require Defendants to maintain adequate and reasonable security measures to protect the PII of Plaintiff and the Class.

122.    Plaintiff and Class Members lack an adequate remedy at law because the injuries here include an imminent risk of identity theft and fraud that can never be fully remedied through damages, ongoing identity theft and fraud.

123.    Further, if an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury. The risk of another such breach is real, immediate, and substantial. Defendants have still not provided adequate information on the cause and scope of the Data Breach. Plaintiff and Class Members lack an adequate remedy at law that will reasonably protect against the risk of a further breach.

124.    Plaintiff and the Class also seek an order requiring Defendants to make full restitution of all monies they received through their wrongful conduct, along with all other relief permitted under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class set forth herein, respectfully requests the following relief:

A.    Certifying this action as a class action under Fed. R. Civ. P. 23 and appointing Plaintiff and his counsel to represent the Class;

B.    Entering judgment for Plaintiff and the Class;

C.    Granting permanent and appropriate injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendants to adequately safeguard the PII of Plaintiff and the Class by implementing improved security controls;

D.    Awarding compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

E.    Award Plaintiff and Class Members statutory or punitive damages as allowed by law in an amount to be determined at trial;

F.     Ordering disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of Defendants' unlawful acts, omissions, and practices;

G.     Awarding to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H.     Awarding pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper; and

I.     Granting such further and other relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable.


Dated:     December 23, 2025     Respectfully submitted,

*/s/ Amber L. Schubert*

Robert C. Schubert (S.B.N. 62684)
Amber L. Schubert (S.B.N. 278696)
Sonum Dixit (S.B.N. 353395)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St., Suite 200
San Francisco, California 94123
Telephone:  (415) 788-4220
Facsimile:  (415) 788-0161
E-mail:  rschubert@sjk.law
          aschubert@sjk.law
          sdixit@sjk.law

*Counsel for Plaintiff Roland Plude and the Putative Class*